IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

04 OCT 28  PM 2: 28

U.S. DISTRICT COURT
N. D. OF ALABAMA

LLOYD REAVES,                          )
                                       )
          Plaintiff,                   )
                                       )
v.                                     )        Civil Action No.: **CV-03-PT-1099-M**
                                       )
CITY OF ATTALLA, ALABAMA,              )
WATER WORKS BOARD,                     )
                                       )        **ENTERED**
          Defendant.                   )
                                                OCT 2 8 2004

## MEMORANDUM OPINION

This cause comes on to be heard upon defendant, City of Attalla, Alabama, Water Works

Board's, Motion for Summary Judgment, filed on September 28, 2004.

### FACTS[1] AND PROCEDURAL HISTORY

Plaintiff Lloyd Reaves was employed as the Water Superintendent and Chief Plant

Operator for the Attalla Water Board from 1988 through 2001. (Reaves Depo., at 15, 18). The

Attalla Water Board supplies the City of Attalla with potable water and fire fighting water; it

does not have any responsibility for the City's sewer system. (*Id.* at 16). In his position Reaves

had supervisory duties and was responsible for hands-on procedures in the water treatment plant.

(*Id.* at 15).

Reaves attended college for one year, receiving no degree or certification. (Reaves

Depo., at 10). However, Reaves did obtain certifications from the State of Alabama as a Grade 3

---

[1] The court notes where "facts" appear disputed.

licensed water operator and a Grade 2 licensed sewer operator. (*Id.*) To obtain these certifications, Reaves attended state-approved classes presented by the Alabama Department of Environmental Management and passed examinations. (*Id.* at 11). Additionally, to maintain these certifications, Reaves participated in continuing education classes each year. (*Id.*) Reaves' certification as a Grade 3 licensed water operator allows him to run groundwater treatment facilities (*Id.* at 13) that use an advanced well water system. (*Id.* at 14).

At the time of his interview and hiring, Reaves spoke with Pat Patterson, who was then the Chairman of the Attalla Water Board. (Reaves Depo., at 22). Reaves claims that, when he was hired, Patterson told him that the Board utilized a policy of "buildup time," under which he was to keep up with the amount of hours he worked each week over forty. In addition to vacation and sick days, these extra hours could later be used as paid time off, or comp time. (*Id.* at 52).

During his first year working for the Water Board, Reaves earned approximately $28,000.00. (Reaves Depo., at 23). When he left the job in 2001, Reaves made approximately $33,000.00 per year. (*Id.* at 27). Generally he was paid the same set amount each week. (*Id.* at 24, 27). However, on one occasion, the Board voted to pay Reaves an additional $1,000.00 for his extra work repairing a major leak over a two week period. (*Id.* at 24-26). Other than this payment, Reaves did not receive any extra bonuses or overtime compensation. (*Id.* at 28).

At the beginning of his employment with the Water Board, Reaves assisted in Attalla's transition from relying on the water system of a neighboring city to creating and maintaining its own water system. (Reaves Depo., at 18-19). After this transition, Reaves' job functions generally remained the same. (*Id.*) As a department head, Reaves was on call 24 hours a day,

2

seven days a week and was responsible for three areas in the water plant: production,

distribution, and maintenance. (*Id.* at 29, 34). In addition to these operational areas, Reaves was

also the supervisor over the meter reading and billing. (*Id.*) Reaves supervised an assistant

superintendent who was in charge of maintenance of the water distribution system, and a meter

foreman who was in charge of reading the water meters. (*Id.* at 35-36).

Reaves, who "was in charge of everything" involving the water system, (Reaves Depo.,

at 33), obtained weekend relief by swapping out weekends with his assistant, who had a Grade 1

certification. (*Id.* at 36-37). This was allowed by the state environmental management

regulators as long as the Grade 1 operator was under Reaves' supervision. (*Id.* at 37). If Reaves

was to be off on a weekend, he would notify the Board and give a number where he could be

reached. (*Id.* at 30). In regard to the water production operations, Reaves testified as follows:

> A.    So you plan on a forty-hour workweek, and we had required work at the
>        water plant on weekends. It was seven days a week. I rotated that with
>        my assistant, Johnny Bates, only under my certification. He was a Grade
>        2—He was a Grade 1 going for Grade 2. Grade 1 certification was not
>        enough. But with [the Alabama Department of Environmental
>        Management's] approval, as long as I signed off on his work, I was
>        responsible, but he would give me some relief on weekends.
> Q.    Okay. And if nothing—if there were no emergency type situations
>        requiring an immediate response and repair, for example, then what
>        responsibility did either you or your assistant have on the weekends?
> A.    Well, if it wasn't the water system as far as leaks or breaks or water
>        outages, it was the work at the—hands-on application work at the water
>        plant, required taking readings, testing of the water, raw and finished
>        water. The maintenance of the filtration system required daily work that
>        had to be done. This thing runs twenty-four hours a day, seven days a
>        week, so everyday you have required maintenance and preparation and
>        cleaning and filtering it back on after backwashing, the main procedures.
> Q.    So those functions required on-site presence by either you or your
>        assistant?
> A.    Yes
>        . . .
> Q.    So it was—would it be fair to say that it was things that required one of

your attention but didn't require a whole lot of man power unless you had
a big break or leak?

A.      Right.

(*Id.* at 29-31).

Reaves further clarified his job duties:

Q.      . . . [C]orrect me if I'm wrong.  I'm trying to make sure I understand your
job.  Monday through Friday as far as water production and plant
maintenance, the daily functions were performed by you?

A.      Correct.

Q.      And if you needed some assistance with bodies, if you just needed some
help, you just got your guys to help you?

A.      Uh-huh (indicating yes).

Q.      And generally Monday through Friday, Mr. Bates [the assistant
superintendent] would come to work and count on taking care of any line
problems or maintenance?

A.      Right.

Q.      And then your meter foreman could come to work expecting to deal with
billing, meter reading, complaints, and those sorts of problems.

A.      Yes, sir.

Q.      Or else forward them up to you?

A.      Right.  We all would overlap.  It was a limited crew.  Sometimes if we had
a twenty-inch main break, I had to do the hands-on at the plant and also go
help install this water main, get down and dirty and muddy.

Q.      Okay.  Now, how big was your pool of people that could be used for any
of these functions you have told me about at one time?  Did you have –

A.      Seven.

Q.      Seven.  Your crew would be seven I guess?

A.      Right.

. . .

Q.      So besides you and Bates [the assistant] you are talking about five?

A.      Right.  And ultimately when the board holds you responsible, nobody else,
I mean, it was up to me.  Meter readings, if a customer came to the board
meeting and said the meter was misread, I was the one questioned.

Q.      Then you are going to go ask your guys?

A.      Right.  I was responsible for getting everything done, whether I had to do
it myself personally – a lot of times I did – or making sure it got done.

Q.      You were where the buck stopped?

A.      Right.

(*Id.* at 37-40).  Regardless of whether Reaves worked a weekend or not, his pay (and that of his

4

assistant, who was also paid a salary) did not change.  (*Id.* at 48).

Reaves made the following statements concerning his use of comp time:

> Q. Correct me if I'm wrong.  During the week if you had a doctor's appointment or took a day off during the middle of the week to do Christmas shopping for example during Christmas season, your weekly amount of pay did not change?
> A. Right, right.
> Q. But you would not have to use a vacation day, for example, an official vacation day in order to do this doctor appointment?
> A. Right.

(Reaves Depo., at 52-53).  Reaves also testified:

> Q. And I take it then if you had one of those long days where you were having to supervise one of your crew members and your crew member wound up working overtime but you had to stay around until he finished, then later on in the week, if you had the opportunity and your job allowed it, you could cut out early one day?
> A. On a rare instance, yes.

(*Id.* at 56-57).

Regarding the supervisory aspects of his job, Reaves testified:

> Q. . . . Suppose one of your guys – somehow you had to discipline one of your crew members?
> A. They follow the writeup procedure.
> Q. Is that something found in the union contract?
> A. The union contract, right.  The first offense is oral warning, where they had a little list of disciplinary actions.  Second offense I think is written warnings with three or five days off.  Third offense is subject to the board terminating them.
> Q. Okay.
> A. I couldn't hire and fire per se.  I would have to do any job as far as the disciplinary, what people were doing, whatever and then inform the board.  And it was the board's decision, what they were going to do. . . .

(Reaves Depo., at 134-35).[2]

---

[2] Defendant maintains that it is clear from Reaves' testimony that he was the one doing the writeups.  Defendant also asserts that Reaves was involved in hiring and firing subject to the

Reaves testified that he and certain members of the Board, including Chairman Don Smith, had disagreements about the existence of what Reaves considered to be payable comp time for hours that he had to work beyond 40 hours per week. (Reaves Depo., at 81-87). He stated that he believed there to be a Board policy under which he would receive a very large amount of money upon his retirement based on all his "unpaid overtime." (*Id.* at 81-82). Reaves testified that other employees of the Board, such as Tommy Worthy, utilized such buildup time. (*Id.* at 61). Worthy, who worked for the Board as an assistant superintendent for more than 20 years, became ill and went on medical leave in approximately 2000. (*Id.*) During this time, Reaves testified, Worthy used his buildup time and was paid for several months that he did not work before he finally went on disability. (*Id.* at 62).

Joy Baker, the office manager for the Board, stated that she knew that Worthy had used such comp time. (Baker Depo., at 66). Baker testified as follows:

> A. Comp time to me is extra time you work other than your normal eight to four-thirty hours.
> Q. Okay.
> A. The salaried employee usually has comp time. They may take off one day but still get paid.
> Q. Okay.
> A. They – they never turn it into money, they just usually take it off; that's my understanding of comp time.
> Q. Okay. But it's – it's turned into money in the sense that if you take it off you get paid for it, right?
> A. Right.

(*Id.* at 56). Baker also testified that she knew there was a distinction between union (hourly) employees and the salaried employees with regard to overtime and comp time based on "past

_____

Board's approval, and subject to a union contract, which applied to the hourly employees but not to him.

practice." (*Id.* at 65).

Smith talked to Reaves about Worthy's use of the buildup time. (Reaves Depo., at 63). Reaves testified that Smith told him that the buildup time did not exist. (*Id.* at 66) According to Reaves, Smith also stated that the existence of such a policy would "break" the Board upon Reaves' retirement.

Reaves testified that other members of the Board, including Burley Hill and Issah Hayes, agreed with him that the Board had a policy of allowing buildup time to be used as comp time. (Reaves Depo., at 86). Reaves further testified that he brought up his belief of such a comp time payment arrangement at approximately four or five Board meetings. (*Id.* at 81-84). According to Reaves, during the last such Board meeting, the Board asked Worthy to attend to discuss his buildup time. (*Id.* at 84). Reaves testified that during this meeting Smith told Worthy that, although he probably was paid for more hours than he should have been, "we are going to consider it even with you on your buildup time." (*Id.* at 85). Also during this meeting, Reaves asked about his buildup time and was told by Smith that it never existed. (*Id.*) Reaves stated that he complained on several occasions about the Board's change in policy and its retroactive elimination of his unused buildup time. (*Id.* at 66-85).

However, defendant disputes Reaves' testimony that the buildup time issue was ever discussed during Board meetings.[3] The minutes of the November 13, 2001 Board meeting, at which Reaves and his attorney were present, do not mention any comp time issues being raised

---

[3] According to defendant, office manager and corporate representative Joy Baker testified that she had reviewed the minutes of the Board meetings from the last several years and had seen no minutes of meetings wherein there was any discussion about comp time from Reaves or anyone else. For this proposition, defendant cites Baker Depo., at 147. However, defendant has failed to provide the cited page with its Evidentiary Submission.

7

by Reaves. (Plaintiff's Ex. 3 to Baker Depo.).[4]  According to defendant, the only mention in the record of comp time from anyone other than Reaves is from his attorney, who wrote a letter dated November 8, 2001. (Plaintiff's Ex. 6 to Baker Depo.).  Further defendant maintains that Reaves made no mention of the "comp time" issue in his testimony before the unemployment compensation hearing examiner.  (Transcript of Hearing before the Administrative Hearing Officer).

After the controversy concerning Reaves' buildup time arose, Smith came to Reaves' work site and told him that he was going to be drug tested.  (Reaves Depo., at 90).  Reaves testified that he told Smith that he was not going to take the drug test because Smith was not following the Board's policy regarding such testing.  (*Id.* at 90-91).  Reaves was suspended without pay from employment on October 31, 2001 for this refusal .  (*Id.* at 95-96).  He was suspended from duty until November 14, the date of the next Water Board meeting.  (*Id.*)  At the November 14th meeting, Reaves argued with the Board and its chairman, Smith, about whether reasonable suspicion had existed for the drug test, and whether the Board had implemented a new drug testing policy in a procedurally incorrect fashion.  (*Id.* at 97-98).  At the meeting Reaves was asked whether he would take a drug test, and he said, "Yes, if you will reinstate my pay."  (*Id.* at 98).  The Board refused, and Reaves was subsequently terminated.  (*Id.* at 113).  At a later meeting, which Reaves was asked to attend, the Board offered him a job as the water plant operator—but not the superintendent.  (*Id.* at 115).  Reaves told the Board that if he could not

---

[4] Defendant also asserts that page three of these minutes, which record the reconvening of the Board on November 16, 2001, at which time Reaves was present, record no mention of comp time issues.  However, defendant has failed to provide the cited page with its Evidentiary Submission.

have his full job back, he would not accept the offer.  (*Id.*)

In his deposition testimony, Reaves stated that, prior to his termination, Board Chairman Smith tried to undermine Reaves' authority, tried to create a general manager job for himself, and wrongfully implemented a revised drug testing policy.  (Reaves Depo., at 89-92).

Reaves filed the current action on May 12, 2003.  Reaves filed an Amended Complaint on June 26, 2003.  The Amended Complaint contained the following counts: Count I - Fair Labor Standards Act (FLSA)[5]; Count II - Breach of Contract[6]; Count III - Work and Labor

---

[5] Count I alleges:

> Plaintiff was not paid for hours worked over forty (40) per week and accrued overtime/compensatory time for the hours worked, based on Attalla's policy. After accruing the compensatory time, Plaintiff was not allowed to use it in full. Following his termination Plaintiff was not paid for any of the compensatory time he accrued during his employment with Attalla.  Defendant willfully violated the FLSA by refusing to pay Plaintiff for hours worked over forty (40) per week and by refusing to allow him to use compensatory time.  Defendant willfully violated 29 U.S.C.A. §207(o)(3)(A) and 29 C.F.R. §553.22 by requiring Plaintiff to accrue more compensatory time than the statutory limit for compensatory time for a government employee.  Defendant willfully violated 29 U.S.C. §307(o)(4) by not allowing Plaintiff to "cash out" his compensatory time at termination. Defendant's actions in terminating Plaintiff after he repeatedly protested Defendant's policy change and its refusal to allow him to use or be paid for his compensatory time was retaliatory and violated 29 U.S.C. §158(a)(4) and 29 U.S.C. §215(a)(3).  Defendant's actions have caused Plaintiff financial hardship and emotional and physical distress.

[6] Count II alleged:

> Plaintiff justifiably relied on the promise by Attalla that he would receive compensatory time in lieu of overtime as a term and condition of employment. Upon termination of Plaintiff's employment, Attalla failed to pay Plaintiff for the accrued compensatory time that he had earned under the terms and conditions of his employment.  As a result of the breach of contract, Plaintiff has suffered financial damages.

9

Done[7]; and Count IV - Tort of Outrage.[8]

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings,

discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue

as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is

genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for

summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477

U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could

---

[7] Count III alleged:

> Defendant owes Plaintiff over $75,000.00, plus interest and costs, for work and
> labor performed by Plaintiff to the Defendant's benefit and at the Defendant's
> request. As a result of Defendants' (*sic*) failure to pay Plaintiff for the work and
> labor he has performed, Plaintiff has been damaged.

[8] Count IV alleged:

> Defendant outrageously and intentionally inflicted emotional distress upon
> Plaintiff by refusing to compensate Plaintiff, either in vacation time or in
> payment, for hours he worked to Defendant's benefit over twelve (12) years, and
> then retaliating against him for protesting by terminating him. Defendant
> authorized, ratified and/or condoned its agents' actions is (*sic*) a maneuver to
> intentionally and purposefully avoid their legal responsibilities pursuant to
> Federal Law. Plaintiff has been irreparably damaged, suffered physical distress,
> financial hardship, and mental anguish as a consequence of defendant's unlawful
> conduct.

The Amended Complaint asks that the court award plaintiff back-pay, liquidated
damages, other compensatory damages, punitive damages, attorney's fees, costs, disbursements,
and interest. Plaintiff also asks that the court "permanently enjoin and issue an injunction
fashioning relief to prohibit the continued implementation of Defendant's scheme of unlawful
employment activities, including its scheme not to pay Plaintiff, and other similarly situated
workers wages in violation of the FLSA."

not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay,* 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS

### I.    Defendant's Motion

#### A.    Plaintiff's Claims Under the Fair Labor Standards Act (FLSA).

Plaintiff alleges that:

> Defendant willfully violated the FLSA by refusing to pay Plaintiff for hours worked over forty (40) per week and by refusing to allow him to use compensatory time. Defendant willfully violated 29 U.S.C.A. §207(o)(3)(A) and 29 C.F.R. §553.22 by requiring Plaintiff to accrue more compensatory time than

11

the statutory limit for compensatory time for a government employee.

(Amd. Cmpt. ¶¶ 21-22).

Defendant asserts that plaintiff was an exempt employee under 29 U.S.C. § 213.  Under

29 U.S.C. § 213, defendant notes, any employee employed in a bona fide executive,

administrative, or professional capacity is exempt from the application of 29 U.S.C. § 207.

According to defendant, the Federal Regulations corresponding to 29 U.S.C. § 213, which were

amended in August 2004, make it clear that plaintiff's position as water superintendent for the

Attalla Water Board was exempt from the application of § 207.

It is defendant's position that Reaves qualifies as an executive employee under § 213.

Under the Regulations, such an employee is one: (1) who is compensated at a rate of not less

than $455.00 per week; (2) whose primary duty is management of the enterprise in which the

employee is employed or of a customarily recognized department or subdivision thereof; (3) who

customarily and regularly directs the work of two or more other employees; and (4) who has the

authority to hire or fire, or whose suggestions and recommendations as to the hiring, firing,

advancement, promotion or any other change of status of other employees are given particular

weight. 29 C.F.R. § 541.100.  *See also* 29 C.F.R. § 541.102 (discussing management activities);[9]

_____

[9] 29 C.F.R. § 541.102 states:

> Generally, "management" includes, but is not limited to, activities such as
> interviewing, selecting, and training of employees; setting and adjusting their
> rates of pay and hours of work; directing the work of employees; maintaining
> production or sales records for use in supervision or control; appraising
> employees' productivity and efficiency for the purpose of recommending
> promotions or other changes in status; handling employee complaints and
> grievances; disciplining employees; planning the work; determining the
> techniques to be used; apportioning the work among the employees; determining
> the type of materials, supplies, machinery, equipment or tools to be used or

29 C.F.R. § 541.103 (stating in part, "[t]he phrase 'a customarily recognized department or subdivision' is intended to distinguish between a mere collection of employees assigned from time to time to a specific job or series of jobs and a unit with permanent status and function"); 29 C.F.R. § 541.104 (stating in part, "[t]o qualify as an exempt executive under § 541.100, the employee must customarily and regularly direct the work of two or more other employees. The phrase 'two or more other employees' means two full-time employees or their equivalent. One full-time and two half-time employees, for example, are equivalent to two full-time employees. Four half-time employees are also equivalent"); 29 C.F.R. § 541.105 (discussing "particular weight");[10] 29 C.F.R. § 541.106 (stating in part, "[c]oncurrent performance of exempt and

_____

> merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

[10] 29 C.F.R. § 541.105 states:

> To determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs. It does not include an occasional suggestion with regard to the change in status of a co-worker. An employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.

nonexempt work does not disqualify an employee from the executive exemption if the requirements of § 541.100 are otherwise met").

Defendant further contends that Reaves' job would also be considered an administrative position as that term is set out in § 213. Under 29 C.F.R. §541.200 an employee employed in a bona fide administrative capacity is one: (1) who is compensated at not less than $455.00 per week; (2) whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer; and (3) whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance. *See also* 29 C.F.R. §541.201 (stating in part, "[t]he phrase 'directly related to the management or general business operations' [requires that] an employee . . . perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment"); 29 C.F.R. §541.202 (stating in part, "[i]n general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term 'matters of significance' refers to the level of importance or consequence of the work performed."); 29 C.F.R. §541.203 (discussing examples under the administrative exemption, including, among others, insurance claims adjusters, certain employees in the financial services industry, and employees who lead a team of other employees assigned to complete major projects). According to defendant, these regulations show that Reaves' position also qualified as an administrative job. Defendant acknowledges that plaintiff may argue that his work at the water plant itself consisted of manual duties, such as taking readings, testing the

14

water, and maintaining the filtration system.  However, defendant maintains that those activities

are "directly related to the . . . operations" of the Attalla Water Board.  *See* 29 C.F.R. §

541.200(a)(2).  Defendant asserts that those activities require the discretion and independent

judgment of someone with advanced training (the Grade 3 certification), as those terms are

defined in the regulations.  *See* 29 C.F.R. § 541.200(a)(3).

Finally, defendant contends that Reaves' position might be considered a "professional"

employee position as set forth in 29 U.S.C. § 213.  Under 29 C.F.R. § 541.300 a professional

employee is one: (1) who is compensated not less than $455.00 per week; and (2) whose primary

duty is the performance of work requiring knowledge of an advanced type in a field of science or

learning customarily acquired by a prolonged course of specialized intellectual instruction, or

requiring invention, imagination, originality or talent in a recognized field of artistic or creative

endeavor.  Defendant acknowledges that Reaves' Grade 3 certification as a water plant operator

does not seem to constitute advanced knowledge acquired through a prolonged course of

instruction.  However, defendant asserts, the regulations note that the professional exemption

areas are continuously expanding.  29 C.F.R. § 541.301(f).  According to defendant, 29 C.F.R. §

541.301(e) gives examples of professional jobs which might be considered similar to that

performed by Reaves.[11]

**B.    Plaintiff's Retaliatory Discharge Claim.**

To show retaliation for asserting rights under the FLSA, a plaintiff must show that: (1) he

engaged in activity protected under the act; (2) he subsequently suffered adverse action by the

---

[11] Among the employees qualifying as having professional positions under 29 C.F.R. §
541.301(e) are certain registered or certified medical technologists, nurses, dental hygienists,
physician assistants, accountants, chefs, athletic trainers, and funeral directors or embalmers.

employer; and (3) a causal connection existed between the employee's activity and the adverse action. *Wolf v. Coca-Cola Co.,* 200 F.3d 1337, 1342-43 (11th Cir. 2000); 29 U.S.C. § 215(a)(3). If the employer asserts a legitimate reason for the adverse action, the plaintiff may attempt to show pretext. *Wolf,* 200 F.3d at 1343-44. In demonstrating causation, the plaintiff has to show that the adverse action would not have been taken "but for" the assertion of the FLSA rights. *Id.* at 1343.

Defendant maintains that Reaves' evidence is too attenuated to present a prima facie claim. *See Wolf,* 200 F.3d at 1343 (stating that indefinite and ambiguous testimony cannot create a genuine dispute of material fact regarding the employer's legitimate explanation for the employee's termination). According to defendant, despite an alleged ongoing disagreement with the Board Chairman about the comp time issue, no adverse action was ever taken against Reaves before he refused to take the drug test. Defendant asserts that Reaves' position that conflict over the comp time issue caused the Board to retaliate against him is "absurd." Defendant also points out that Reaves testified that the Board offered him his job back, albeit with less prestige. Defendant concludes that the evidence is too weak to constitute a genuine dispute of material fact regarding either the prima facie case or a showing of pretext.

### C.   Plaintiff's Contract and Work and Labor Done Claims.

Reaves testified that before he took the position with the Water Works Board in 1988, he discussed the terms of employment regarding compensatory time with then Chairman of the Board Patterson. (Reaves Depo., at 75). Concerning this discussion, Reaves testified as follows:

> A.   My discussion was that I would receive my regular salary each week and any overtime that I put in was to be kept up on time sheets and considered buildup time. And then when you keep up with your buildup time, even though you will put in a lot more than you take off, but that is for times

> > that you need to take off a day, just as long as you document it, everything is fine.
> > Q.    Okay.  Anything else said by him about buildup time that you can recall?
> > A.    No, sir.

(*Id.* at 75-76).  Reaves further stated that he never received any accounting from the Water Board regarding "buildup time," but that he recorded it himself when he recorded his hours on his time sheets.  (*Id.* at 75).

Defendant asserts that plaintiff fails to prove a contract regarding the alleged "buildup time."  According to defendant, other than the purported discussion with Patterson prior to Reaves taking the job with the Board, Reaves relies only on his own ideas about what the Water Board's "buildup time" policy was.  At most, defendant maintains, the alleged discussion with Patterson only indicated that Reaves' position would be similar to that of other salaried employees, in that at some times he would be required to work longer hours and at others he would be allowed to take time off without having to use a sick or vacation day.  Additionally, according to defendant, plaintiff's conclusory testimony is the only evidence of an agreement that unused comp time would be converted into a lump sum payment at the end of the employment.

Defendant further argues that the statute of frauds under Alabama law prevents the creation of the sort of contract plaintiff alleges existed.  Defendant argues that the one-year provision of the statute of frauds would apply to such a contract.  Ala. Code § 8-9-2(1).  Therefore, as there is no writing evidencing the contract, it is void.  *See Ex parte Ramsay,* 829 So.2d 146, 155 (Ala. 2002) (holding that a contract fit within the one-year provision of the statute of frauds when it required two or three years of performance).

Defendant contends that the arguments discussed above regarding plaintiff's contract

17

claim also apply to plaintiff's work and labor done claim.

### D.     Plaintiff's Outrage Claim.

Plaintiff claims that the Water Board's actions constitute the tort of outrage under

Alabama law.  In order to establish a claim of outrage under Alabama law, a plaintiff must

prove: (1) that the defendant's conduct was intentional or reckless; (2) that it was extreme and

outrageous; and (3) that it caused emotional distress so severe that no reasonable person could be

expected to endure it. *Chalal v. Northwest Med. Center, Inc.,* 147 F. Supp. 2d 1160, 1183-84

(N.D. Ala. 2000) (citing *Ex parte Crawford & Co.*, 693 So.2d 458, 460 (Ala.1997)).  Regarding

the "extreme and outrageous" element, the Alabama Supreme Court has acknowledged that the

cases in which there has been sufficient evidence to create a jury question fit into three

categories: (1) those involving wrongful conduct in the context of family burials; (2) those in

which insurance agents employed heavy-handed, barbaric means in attempting to coerce the

insured into settling an insurance claim; and (3) those involving egregious sexual harassment.

*Chalal,* 147 F. Supp.2d at 1184 (citing *Crawford*, 693 So.2d at 460 n.1).  Additionally, the

Alabama Supreme Court has made clear that the tort of outrage is only applicable to "conduct so

outrageous in character and so extreme in degree as to go beyond all possible bounds of decency,

and to be regarded as atrocious and utterly intolerable in a civilized society." *Chalal,* 147 F.

Supp.2d at 1184 (quoting *American Road Serv. Co. v. Inmon*, 394 So.2d 361, 365 (Ala.1980)).

Defendant asserts that plaintiff's allegations do not rise to the level of conduct necessary

for an outrage claim under Alabama law.  According to defendant, the Board's alleged conduct

does not fit within any of the three categories of outrageous conduct recognized by the Alabama

Supreme Court.  Further, defendant contends, such conduct is not "so outrageous in character"

18

"as to go beyond all possible bounds of decency" as required by *Inmon*.

**II.      Plaintiff's Response**

Plaintiff argues that defendant has violated the law in three ways. First, plaintiff contends, defendant did not comply with the FLSA requirement that compensation time be computed at 1 ½ times the number of hours actually worked. Second, plaintiff argues, defendant did not follow the rules regarding the maximum hours accrued, capped at 480. *See* 29 U.S.C.A. § 207(o)(3)(A) (capping compensatory time for employees engaged in a public safety activity, an emergency response activity, or a seasonal activity). Third, plaintiff asserts, defendant did not comply with the FLSA requirement that the comp time be cashed out at the separation of plaintiff's employment. 29 U.S.C.A. § 207(o)(4).

**A.      Plaintiff Was Not an Exempt Employee Under FLSA.**

Plaintiff disputes defendant's claim that he was an exempt employee and was not due any compensation for the hours over forty per week that he worked.

**1.      Effect (or Lack Thereof) of the New Regulations.**

In its brief in support of its Motion for Summary Judgment, defendant relied on the new regulations under FLSA that became effective on August 23, 2004. Plaintiff contends that these new regulations cannot be applied retroactively and, thus, have no effect on this cause of action which arose three years before their enactment. According to plaintiff, the application of the new regulations to this case would be illogical. For example, plaintiff asserts, if he were to now claim that he has been improperly classified based on any changes in the regulations, the employer would be able to defend such a claim by asserting its lack of knowledge of the future regulations.

19

The U.S. Supreme Court stated in *Landgraf v. USI Film Products*: "where [a statute applied retroactively] would impair rights a party possessed when he acted, increase his liability for past conduct, or impose new duties with respect to transactions already completed . . . the traditional presumption teaches that the statute does not govern absent clear congressional intent favoring such a result." 511 U.S. 244, 245 (1994). In the administrative context, plaintiff argues, a rule should not be applied retroactively if it "'takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past.'" *National Min. Ass'n v. U.S. Dept. of Interior*, 177 F.3d 1, 8 (D.C. Cir. 1999) (quoting *Association of Accredited Cosmetology Schs. v. Alexander*, 979 F.2d 859, 864 (D.C. Cir. 1992)). According to plaintiff, the critical question is whether a challenged rule establishes an interpretation that "changes the legal landscape." *National Min. Ass'n*, 177 F.3d at 8 (quoting *Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 423-24 (D.C. Cir. 1994)).

Plaintiff argues that, in this case, the retroactive application of the new regulations would increase a party's liability for past conduct. Therefore, plaintiff contends, the new regulations should not be applied to this action. However, plaintiff acknowledges that the new regulations are not so different from the predecessor regulations as to make much difference. For purposes of his response, plaintiff attacked the regulations applied by defendant, arguing that, even under the new regulations, defendant would not be entitled to summary judgment.

## 2. Under the New Regulations, None of the Exemptions Apply.

Plaintiff asserts that the new regulations make it clear that "job title alone is insufficient to establish the exempt status of an employee." 29 C.F.R. § 541.2. Additionally, 29 C.F.R. §

20

541.3 states:

> The . . . exemptions and the regulations in this part do not apply to manual laborers or other "blue collar" workers who perform work involving repetitive operations with their hands, physical skill and energy. Such nonexempt "blue collar" employees gain the skills and knowledge required for performance of their routine manual and physical work through apprenticeships and on-the-job training, not through the prolonged course of specialized intellectual instruction required for exempt learned professional employees such as medical doctors, architects and archeologists.

Plaintiff notes that there are three categories of exempt employees: executive, administrative, and professional.

### a.     Plaintiff is Not an Executive Under the Regulations.

Plaintiff asserts that there are four components to the executive exemption.  To fit within the exception a person must: (1) have a salary of at least $455 per week; (2) have the primary duty of management of the enterprise where the person works or of a department thereof; (3) customarily direct  two or more employees; and (4) have authority to hire and fire or the ability to give recommendations that are given weight in such decisions.  29 C.F.R. §541.100.

Plaintiff argues that he meets the third prong of this test, but does not satisfy the three other requirements.  First, plaintiff contends, there is no evidence in the record or presented by defendant that his "primary duty" was managing.  As opposed to a manager who sits behind a desk and directs the work of others, plaintiff argues that he was a manual laborer, actually doing the physical work himself.  Plaintiff states that, although he had some authority over employees of the Board, his primary duty was not supervising.  According to plaintiff, the evidence shows that the Board actually made the decisions regarding interviewing and selecting employees, setting and adjusting rates of pay, controlling the flow of distribution of materials, controlling the budget, etc., as required by 29 C.F.R. § 541.102.

21

According to plaintiff, he was more like the type of employee described by 29 C.F.R. §541.106(c), which states:

> a relief supervisor or working supervisor whose primary duty is performing nonexempt work on the production line in a manufacturing plant does not become exempt merely because the nonexempt production line employee occasionally has some responsibility for directing the work of other nonexempt production line employees when, for example, the exempt supervisor is unavailable. Similarly, an employee whose primary duty is to work as an electrician is not an exempt executive even if the employee also directs the work of other employees on the job site, orders parts and materials for the job, and handles requests from the prime contractor.

Plaintiff maintains that there is a factual dispute between the parties regarding whether plaintiff's primary duty was working in the field or managing.  He further argues that there is ample evidence for a jury to conclude that he was more of a manual laborer who gave some direction to a limited number of employees.

Moreover, plaintiff contends, he was not truly a salaried employee because he was disciplined by a reduction in his pay.  Plaintiff points out that the Department of Labor has a "no-docking" rule regarding unpaid disciplinary suspensions.  29 C.F.R. § 541.602(a).[12]  Plaintiff asserts that the Supreme Court has ruled that the no-docking rule is valid with regard to state and local governments.  *Auer v. Robbins*, 519 U.S. 452, 457-58 (1997).  Plaintiff maintains that this rule only allows an employer to take away pay from a "salaried" employee in limited

---

[12] 29 C.F.R. § 541.602(a) states in part:

> An employee will be considered to be paid on a "salary basis" within the meaning of these regulations if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed.

circumstances, least the employee become non-exempt. *See* 29 C.F.R. § 541.602(b)(1)-(7) (listing exceptions for the prohibition against deductions).[13]  Plaintiff argues none of the exceptions apply in this case.

According to plaintiff, the fact that he was disciplined through a suspension at the end of his employment with defendant is evidence that he does not meet the requirements of the salary test. *Davis v. City of Hollywood,* 120 F.3d 1178 (11th Cir. 1997) (discussing effect of deductions on exempt status).[14]  Therefore, plaintiff argues, he does not meet the salary prong of the test for exempt employees.  29 C.F.R. § 541.602. *See also Debrecht v. Osceola County,* 243 F. Supp. 2d 1364, 1368-69 (M.D. Fla. 2003) (discussing salaried employee status).[15]

>    **b.    Plaintiff is Not an Administrative Employee Under the**
>
>    **Regulations.**

-------------------------

[13] The exceptions to the no docking rule include:

> . . . Deductions from pay [when] absent from work for one or more full days for personal reasons, other than sickness or disability . . . Deductions from pay . . . made for absences of one or more full days occasioned by sickness or disability (including work-related accidents) . . . offsets [for] amounts received by an employee as jury fees, witness fees or military pay. . . Deductions from pay . . . imposed in good faith for infractions of safety rules of major significance . . . Deductions from pay for unpaid disciplinary suspensions of one or more full days imposed in good faith for infractions of workplace conduct rules . . . [deductions] in the initial or terminal week of employment . . . [deductions] for weeks in which an exempt employee takes unpaid leave under the Family and Medical Leave Act.

29 C.F.R. § 541.602(b).

[14] In *Davis*, the court found that the defendant utilize the "window of correction" for such deductions by reimbursing the amounts to the employees.  120 F.3d at 1180.  Plaintiff argues that there is no evidence here that defendant similarly attempted to correct the deduction.

[15] Plaintiff maintains that he fails to meet the requirement of the salary prong for each of the exceptions.

Plaintiff asserts that the requirements for administrative employees are as follows: (1) compensation at a salary of at least $455 per week; (2) primary duty of performing office or non-manual work directly related to management; and (3) primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.  29 C.F.R. § 541.200.

Plaintiff argues he does not fall under the administrative exemption.  Plaintiff contends there is no evidence that he worked in an office or that he did not do manual work.  Plaintiff notes that the examples of persons covered by this exemption include insurance claims adjusters, financial service employees and human resource employees.  29 C.F.R. § 541.203.  Plaintiff argues that his job was more akin to that of an inspector, who would not fall within the administrative employee exemption.  *Id.*

### c.      Plaintiff is Not a Professional Employee Under the Regulations.

The requirements for a professional employee include the primary duty of work that requires "knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction" or creative endeavors.  29 C.F.R. § 541.300.  Plaintiff argues that it is clear he would not fall into this category as he did not receive a prolonged course of instruction.

### 3.      Defendant's Telling Plaintiff That He Would Receive Compensatory Time and Allowing Him to Use Compensatory Time Defeats Its Argument of Exemption.

Plaintiff argues that Office Manager Baker's testimony of the Board's "past practice" of

24

giving comp time and the information provided about Tommy Worthy's use of comp time are evidence that defendant utilized comp time for employees that it now claims were exempt. Plaintiff maintains that this past practice shows that he was, in fact, a non-exempt employee. According to plaintiff, if an employer provides comp time to its employees, as did the defendant here, then the employee is not truly being compensated by salary alone.

Plaintiff argues that the regulations provide no basis for classifying him as exempt. Therefore, plaintiff contends, defendant should have been paying him time and one-half for all of the hours over forty he worked in each week. In the alternative, plaintiff maintains that defendant should have been giving him the equivalent of the extra hours he worked in comp time, up to the limits imposed by the statute.

Finally, plaintiff argues that exemptions under FLSA are to be construed narrowly against the defendant. *Debrecht v. Osceola County,* 243 F. Supp. 2d 1364, 1367 (M.D. Fla. 2003) (citing *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995)). Additionally, plaintiff states that whether the exemption applies to an employee is an affirmative defense on which the employer has the burden of proof. *Ake v. Tennessee Valley Authority,* 2002 U.S. Dist. LEXIS 26590, *11 (N.D. Ala. 2002) (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974)). Based on the evidence, plaintiff concludes, there is ample proof that he should have been classified as non-exempt and is due money for the hours of overtime that he worked.

**B.      Plaintiff Was Retaliated Against For His Complaints Regarding Defendant's Violation of the FLSA.**

The FLSA protects persons against retaliation for asserting their rights under the statute.

*Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342 (11th Cir. 2000).  *See also* 29 U.S.C. § 215(a)(3) (making it unlawful to "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to" the Act).

To establish a prima facie case of retaliation, the plaintiff must demonstrate that: (1) he engaged in activity protected under the Act; (2) he subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action.  *Wolf*, 200 F.3d at 13342-43.  Plaintiff argues that he has made a prima facie showing in this case.  First, plaintiff contends, it is undisputed that he complained about his not receiving compensation for the hours over forty per week that he had worked during his employment with defendant.  Plaintiff asserts that he and Smith had repeated conversations regarding the matter. Plaintiff also points out that he was terminated by defendant after making these complaints and, therefore, satisfies the second prong.  Plaintiff further maintains that there is a causal connection between plaintiff's complaints and his termination.  Plaintiff states that, even in the conversation in which he was terminated, he discussed the fact that he had not been paid according to the Board's policy.

The defendant has stated that its legitimate reason for terminating plaintiff was his failure to take a drug test.  However, plaintiff argues that this reason is pretextual and would not necessarily be believed by a jury.  To support his argument that defendant's reason is a pretext, plaintiff points toward the timing of plaintiff's complaints relative to his termination and toward Smith's disagreement with plaintiff's complaints.  Additionally, plaintiff asserts that the Board's violation of its own policy in ordering the drug test is also evidence of pretext.  *See Bass v.*

*Board of County Com'rs, Orange County, Fla.,* 256 F.3d 1095, 1108 (11th Cir. 2001) (stating

that, "[a]n employer's violation of its own normal . . . procedure may be evidence of pretext").

> **C.    Defendant Breached Its Contract to Plaintiff When It Took Away His**
>
> **Buildup Time and Did Not Pay Him For It.**

Plaintiff disputes defendant's position that the statute of frauds prevents him from

recovering under a contract theory in this case.  Although there was never a formal, written

contract regarding the comp time issue, plaintiff asserts he can still recover on an oral contract

between the parties.  Plaintiff asserts that this oral contract was created when he was hired by the

defendant and was renewed throughout his employment.

It is plaintiff's position that the statute of frauds does not void this contract because it has

already been executed and is not an executory contract.  A contract is executory if neither party

has fully performed his obligation to the other party.  *Ex parte Ramsay,* 829 So.2d 146, 155 (Ala.

2002).  A contract is executed and not voided by the statute of frauds if the plaintiff has fully

performed his obligation to the defendant and sues the defendant to obtain the defendant's

performance or the completion of the defendant's performance.  *Id.* (citing *Leisure American*

*Resorts, Inc. v. Knutilla,* 547 So.2d 424 (Ala. 1989)).

Plaintiff asserts that he fully performed his obligation to the defendant by working the

hours necessary to complete the fulfillment of his duties.  According to plaintiff, defendant

partially performed its obligation by allowing plaintiff to use some of his buildup time.  Plaintiff

maintains that, when Smith told him that his comp time no longer existed, defendant breached

the contract.  Plaintiff highlights the testimony of Baker, a current employee of defendant, that

comp time was utilized by defendant as a "practice."  Therefore, plaintiff maintains, defendant's

failure to allow plaintiff to use his comp time and/or to pay him for it at his separation from the employment was a breach of the executed contract.

### D.  Defendant Refused to Pay Plaintiff for Work and Labor That He Had Provided for the Defendant's Benefit.

An action for work and labor done seeks equitable relief and is a method of avoiding unjust enrichment. *Phillips v. Fuller*, 814 So.2d 885, 888 (Ala. Civ. App. 2001). Such an action requires either an express or an implied contract. *Id.* "'The rule is that if one knowingly accepts services rendered by another, and the benefit and result thereof, the law implies a promise on the part of the one who so accepts with knowledge, to pay the reasonable value of such services rendered.'" *Id.* (citing *Richards v. Williams*, 165 So. 820, 823 ( Ala. 1936)). In order to succeed on a claim of unjust enrichment, the plaintiff must show that he had a reasonable expectation of compensation for his services. *Phillips*, 814 So.2d at 888 (citing *Utah Foam Prods., Inc. v. Polytec, Inc.*, 584 So.2d 1345, 1350 (Ala. 1991)).

Plaintiff argues that the testimony in this case demonstrates that he had a reasonable expectation of compensation for his services. According to plaintiff, the evidence shows there was a practice of using comp time for employees the Board classified as "salaried," including Baker and Worthy. Plaintiff asserts that he has first-hand knowledge that Worthy used approximately three months of comp time at the end of his employment, when he was not able to come to work. Therefore, plaintiff asserts, he had no reason to believe that comp time would not also be applicable to him. According to plaintiff, defendant received the benefit of his work but did not compensate him for it.

### III.  Defendant's Reply.

A.      **FLSA Overtime Claim.**

1.      **Executive Exemption.**

Defendant contends that plaintiff's Response fails to prove that plaintiff's job was not one exempted under 29 U.S.C. § 207.  To rebut plaintiff's argument that there is no evidence that his primary duty was managing, defendant highlights the following portions of plaintiff's testimony:

- Plaintiff stated that he had to sign off on his subordinates work at the water plant.

- He stated that he was "in charge of everything."

- When his subordinates were unable to handle problems, they were forwarded up to plaintiff.

- Plaintiff testified that he was held responsible by the Board for getting the work of the water system accomplished.

- Plaintiff stated that, if a customer came to a Board meeting and complained that his water meter had been misread, plaintiff would be the one questioned.

- Plaintiff testified, "I was responsible for getting everything done, whether I had to do it myself-personally—a lot of times I did—or making sure it got done."

- When asked, plaintiff agreed that he was "where the buck stopped."

- Plaintiff stated, "[w]hen it got down to it, the operations were under [him]."

- Plaintiff testified, "I would have to do any job as far as the disciplinary, what people were doing, whatever, and then inform the Board . . ."

(Reaves Depo., at 33, 37-40, 110, 134-35).

Defendant argues that, to any extent that plaintiff's duties would be considered as

29

"concurrent duties" under 29 C.F.R. § 541.106[16], the provisions of that section as well as those of

29 C.F.R. §541.700[17], 29 C.F.R. §541.701[18], 29 C.F.R. § 541.703[19], and 29 C.F.R. § 541.707[20]

---

[16] 29 C.F.R. § 541.106(a) provides in part: "Concurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of § 541.100 are otherwise met."

[17] 29 C.F.R. §541.700(a) states:

> To qualify for exemption under this part, an employee's "primary duty" must be the performance of exempt work. The term "primary duty" means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

[18] 29 C.F.R. §541.701 provides:

> The phrase "customarily and regularly" means a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed "customarily and regularly" includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks.

[19] 29 C.F.R. § 541.703(a) states:

> Work that is "directly and closely related" to the performance of exempt work is also considered exempt work. The phrase "directly and closely related" means tasks that are related to exempt duties and that contribute to or facilitate performance of exempt work. Thus, "directly and closely related" work may include physical tasks and menial tasks that arise out of exempt duties, and the routine work without which the exempt employee's exempt work cannot be performed properly. Work "directly and closely related" to the performance of exempt duties may also include recordkeeping; monitoring and adjusting machinery; taking notes; using the computer to create documents or presentations; opening the mail for the purpose of reading it and making decisions; and using a

apply in this case to show that plaintiff's former position fits within the executive exemption.

Defendant further contends that plaintiff's "no docking" rule argument is without merit. According to plaintiff's testimony, defendant notes, he was told to go home at the time of his suspension. Defendant asserts plaintiff was not required to work during this time period. Defendant points to 29 C.F.R. §541.602, which provides in part: "Exempt employees need not be paid for any workweek in which they perform no work."

Finally, defendant maintains, the authorities cited by plaintiff in support of his "no docking" argument fail to address his situation: a suspension without pay until a hearing was provided regarding termination. Additionally, defendant asserts that plaintiff failed to address the exceptions to the prohibition against deductions found at 29 C.F.R. §541.602(b)(4) and (5). These exceptions allow deductions for penalties imposed in good faith for infractions of safety rules of major significance, 29 C.F.R. §541.602(b)(4), and for unpaid disciplinary suspensions of one or more full days imposed in good faith for infractions of workplace conduct rules, 29 C.F.R. §541.602(b)(5). Defendant asserts that its reason for plaintiff's suspension, his refusal to

---

photocopier or fax machine. Work is not "directly and closely related" if the work is remotely related or completely unrelated to exempt duties.

[20] 29 C.F.R. § 541.707 states:

Occasional, infrequently recurring tasks that cannot practicably be performed by nonexempt employees, but are the means for an exempt employee to properly carry out exempt functions and responsibilities, are considered exempt work. The following factors should be considered in determining whether such work is exempt work: Whether the same work is performed by any of the exempt employee's subordinates; practicability of delegating the work to a nonexempt employee; whether the exempt employee performs the task frequently or occasionally; and existence of an industry practice for the exempt employee to perform the task.

31

take a drug test, would fit within either of these two exceptions.

### 2.    Administrative Position.

Defendant maintains that, although plaintiff did manual labor at times, his primary

responsible was supervising other employees in the areas of meter reading, billing, maintenance,

and water production operations.  Defendant further contends that plaintiff's job as

superintendent required the exercise of discretion and independent judgment with respect to

matters of significance, including manpower allotment and emergency response.  Additionally,

defendant argues, plaintiff had nearly unfettered authority over his department and crew.

Therefore, defendant asserts, plaintiff's former position is exempt under the administrative

exception contained in 29 C.F.R. § 541.200.  According to defendant, it is also clear that

plaintiff's work was "directly related to the management or general business operations" of the

Board, under 29 C.F.R. § 541.201, and that he possessed "discretion and independent judgment"

as set forth in 29 C.F.R. § 541.202.  Finally, defendant states that plaintiff's duties can be

analogized to the examples of administrative exemption positions set out in 29 C.F.R. § 541.203.

### 3.    Professional Exemption.

According to defendant, among the learned professional careers which might be

analogized to Reaves' former position are those of registered or certified medical technologists,

dental hygienists, chefs, paralegals, athletic trainers, and funeral directors or embalmers.  *See* 29

C.F.R. § 541.301(e).

### 4.    Plaintiff's Comp Time Argument.

Defendant asserts that plaintiff's comp time argument fails.  Defendant argues that the

hallmark of a salaried, exempt position is the ability to leave early on one day with no change in

salary or in other terms or conditions of employment in compensation for long hours of work required on other days. Defendant maintains that plaintiff specifically stated that he had this ability.

### B.     Retaliatory Discharge.

Defendant notes that plaintiff must show that his dismissal would not have occurred but for his assertion of FLSA rights. *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1343 (11th Cir. 2000). Defendant argues that there is no evidence that plaintiff complained about the comp time issue prior to his termination other than plaintiff's testimony and a letter from plaintiff's lawyer written on November 8, 2001. Defendant asserts that plaintiff made no mention of the comp time issue in his testimony before the unemployment compensation hearing examiner. Therefore, defendant argues plaintiff has not made a prima facie case.

In the alternative, defendant maintains that even if plaintiff has made a prima facie case, he has failed to show that the Board's legitimate reason for his termination was a pretext. Defendant disputes plaintiff's argument that the Board's violation of its own policy in ordering the drug test is evidence of pretext. Plaintiff cites *Bass v. Board of County Com'rs, Orange County, Fla.,* 256 F.3d 1095 (11th Cir. 2001), in support of this argument. Defendant maintains that plaintiff's reliance on *Bass* is misplaced. According to defendant, plaintiff's argument is that the Board's random drug testing policy was not passed in a proper manner because it was not voted on by the employee's union. Defendant asserts that *Bass*, however, dealt with failure to follow detailed hiring regulations, a totally different kind of procedural issue. Further, defendant argues that plaintiff was not even a member of the employee's union.

### C.     Contract Claim.

33

Defendant argues that plaintiff's own testimony shows that the buildup time was discussed between him and Patterson as something to use when "you need to take off a day." According to defendant, nothing else was said about buildup time by Patterson. Defendant maintains that there was no statement or commitment to pay for plaintiff's alleged buildup time at the conclusion of his employment with the Board. Defendant further asserts that, according to the plaintiff's own version of the discussion between him and Patterson, plaintiff received what he bargained for, time off when he needed it.

**D.    Work and Labor Done.**

According to defendant, plaintiff's argument concedes that he did not develop an expectation of being paid for his accumulated buildup time until the Board paid Worthy for the weeks he did not work because of illness. Therefore, defendant asserts, plaintiff's expectation of payment arose too late to form an obligation under a work and labor done theory. Defendant agues that plaintiff does not have a claim for work and labor done simply because Worthy received something he did not.

**E.    Outrage Claim.**

Defendant asserts that plaintiff has failed to argue the outrage claim and appears to concede that it is due to be dismissed.

## CONCLUSIONS OF THE COURT

The plaintiff has acknowledged that there is not a significant difference between the present FLSA regulations and earlier regulations.[21]  This court agrees and notes the following:

---

[21] In this case, plaintiff was terminated on or about November 14, 2001.  He brought this action on May 12, 2003.  The statute of limitations for a FLSA claim is two years.  Regarding causes of action for unpaid minimum wages, unpaid overtime compensation or liquidated

34

**Changes in the FLSA Regulations.**

    **A.**    **Executive Exemption**

        **1.**    **29 C.F.R. § 541.100 – Requirements of the Executive Exemption**

29 C.F.R. § 541.100 in the 2004 Code corresponds to 29 C.F.R. § 541.1 in the 2001

version of the Code. The requirements of both versions are largely the same. However the older

version had the additional requirement that the exempt employee customarily and regularly

exercises discretionary powers. Additionally, the 2001 version required that an exempt

employee not devote more than 20 percent of his hours of work in the workweek to activities

which are not directly and closely related to the performance of the executive work described by

the other requirements. Finally, the old version required a salary of not less than $155 per week

(instead of $455).

        **2.**    **29 C.F.R. § 541.102 – Defining "Management"**

Although the format of this regulation changed from the 2001 version, the content of both

versions is much the same.

        **3.**    **29 C.F.R. § 541.103 – Defining "Department or Subdivision"**

The current 29 C.F.R. § 541.103 corresponds to 29 C.F.R. § 541.104 in the 2001 version.

---

damages under FLSA, 29 U.S.C. § 255 states in part:

> if the cause of action accrues on or after May 14, 1947[, it] may be commenced
> within two years after the cause of action accrued, and every such action shall be
> forever barred unless commenced within two years after the cause of action
> accrued, except that a cause of action arising out of a willful violation may be
> commenced within three years after the cause of action accrued.

The court does not reach the issue of whether any FLSA claim accruing before May 12,
2001 would be barred in any event.

Unlike the current version, the 2001 version stated that in order to properly "classify an individual as an executive he must be more than merely a supervisor of two or more employees; nor is it sufficient that he merely participates in the management of the unit. He must be in charge of and have as his primary duty the management of a recognized unit which has a continuing function." However, on the whole, the two versions are much the same.

### 4.   29 C.F.R. § 541.104 – Defining "Two or More Other Employees"

The current version of 29 C.F.R. § 541.104 corresponds to 29 C.F.R. § 541.105 in the 2001 version. There are no significant differences between the two versions.

### 5.   29 C.F.R. § 541.105 – Defining "Particular Weight"

There does not appear to be a corresponding section in the 2001 version to the current 29 C.F.R. § 541.105.

### 6.   29 C.F.R. § 541.106 – Defining "Concurrent Duties"

There does not appear to be a corresponding section in the 2001 version to the current 29 C.F.R. § 541.106.

### B.   Administrative Exemption

### 1.   29 C.F.R. §541.200 – Requirements of the Administrative Exemption

The current version of 29 C.F.R. § 541.200 corresponds to 29 C.F.R. § 541.2 in the 2001 version. In addition to the current requirements, the 2001 version also required that the exempt employee either: (1) directly assist a proprietor, or an employee employed in a bona fide executive or administrative capacity; or (2) perform, under only general supervision, work along specialized or technical lines requiring special training, experience, or knowledge; or (3) execute, under only general supervision, special assignments and tasks. The older version also

required that the exempt employee not devote more than 20 percent of his hours worked in the

workweek to activities which are not directly and closely related to the performance of

administrative work.  Finally, the older version had a salary requirement of only $155 per week

(as opposed to the $455 currently required).

2. **29 C.F.R. §541.201 – Defining "Directly Related to Management or General Business Operations"**

The current version of 29 C.F.R. § 541.201 corresponds to 29 C.F.R. § 541.205 in the

2001 version.  In addition to giving a much more detailed discussion of the phrase, the older

version limited the exemption "to persons who perform work of substantial importance to the

management or operation of the business of his employer or his employer's customers."

3. **29 C.F.R. §541.202 – Defining "Discretion and Independent Judgment"**

The current version of 29 C.F.R. § 541.202 corresponds to 29 C.F.R. § 541.207 in the

2001 version.  Unlike the newer version, the 2001 Code gives many specific examples of what

does and does not constitute "discretion and independent judgment."  The new Code, however,

gives specific factors to consider in determining whether an employee has the requisite

discretion.

4. **29 C.F.R. §541.203 – Giving Administrative Exemption Examples**

The current version of 29 C.F.R. § 541.203 corresponds to 29 C.F.R. § 541.201 in the

2001 version.  Unlike the new version, which gives several examples, § 541.201 in the older

version discusses three specific types of administrative employees: (1) executive and

administrative assistants; (2) Staff employees; and (3) employees who perform special

37

assignments.

### C.   Professional Exemption

#### 1.   29 C.F.R. § 541.300 – Requirements of the Professional Exemption

The current version of 29 C.F.R. § 541.300 corresponds to 29 C.F.R. § 541.3 in the 2001 version. In addition to the current requirements, the older version also required that the exempt employee not devote more than 20 percent of his hours worked in the workweek to activities which are not an essential part of and necessarily incident to the professional work. Further, the older version had a salary requirement of only $170 per week (as opposed to the $455 currently required).

#### 2.   29 C.F.R. § 541.301 – Discussing Professional Exemption

The current and 2001 versions of 29 C.F.R. § 541.301 are worded and organized differently, but their content is much the same. However, unlike the old version, the current Code gives a list of examples of professional employees.

The court concludes that there is no reasonable inference other than that the plaintiff was an exempt employee under the FLSA. It is clear that his primary duty was as water superintendent and chief plant operator. There is no reasonable inference that he was other than an executive employee. The court does not reach the issues related to the administrative or professional exemptions. The court does not reach the merits of the basic FLSA claim if it were assumed that plaintiff was not an exempt employee. It does appear to be somewhat of a late blooming claim.

The FLSA retaliation claim will be dismissed for two reasons. (1) Since plaintiff does not have a bona fide underlying FLSA claim, there is no basis for a retaliation claim. (2) There

38

is no reasonable inference that plaintiff's termination was caused by his alleged discussions related to comp time.  The evidence is overwhelming that his termination related to the drug testing issue.

The court, in its discretion, declines to take supplemental jurisdiction of the state law claims and will dismiss these claims without prejudice.

This 28th of October, 2004.

**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**